# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CRISTA and ANGEL DOUGHERTY,
individually and on behalf of all
others similarly situated,

      Plaintiffs,

      v.

DREW UNIVERSITY,

      Defendant.

Civ. No. 21-00249 (KM) (ESK)

**OPINION**

__KEVIN MCNULTY, U.S.D.J.__:

In response to the COVID-19 pandemic, Drew University transitioned to virtual instruction and suspended campus operations. Angel Dougherty, an undergraduate during the Spring 2020 semester, and her mother, Crista Dougherty, have sued the University, asserting contract and tort claims on the theory that the University did not provide the education and college experience she had a right to expect. The University moves to dismiss the complaint for failure to state a claim. (DE 6.)[1] For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

Angel Dougherty studied art as an undergraduate student at Drew University, a private institution in New Jersey. (Compl. ¶¶ 13–14.) She entered

---

[1]    Certain citations to the record are abbreviated as follows:

DE = docket entry

Notice = Notice of Removal (DE 1)

Compl. = Complaint (DE 1-2)

Mot. = The University's Brief in Support of its Motion to Dismiss (DE 6)

Opp. = The Doughertys' Opposition to the University's Motion to Dismiss (DE 9)

RR = Reservation of Rights (DE 6, Ex. H)

her final semester in Spring 2020. (*Id.* ¶ 13.) Her course of study naturally would entail in-person instruction and events; for example, her degree program usually culminates in a live gallery show. (*Id.*)

Angel's mother, Crista,[2] financed her spring semester. (*Id.* ¶ 14.) Tuition for that semester cost the average undergraduate $19,914. (*Id.* ¶ 21.) Crista paid approximately $8,000 in tuition, as well as an "Art Fee" of $75, a "Parking Fee" of $200, and a "Technology Fee" of $125. (*Id.* ¶ 14.)[3]

For Crista and Angel, as for all of us, the spring of 2020 did not unfold as expected. The COVID-19 pandemic swept through the world in the early months of 2020. In March 2020, the University suspended in-person classes, closed the campus, and transitioned courses to a virtual-instruction format. (*Id.* ¶¶ 33–34.) This mode of instruction, according to the Complaint, was "subpar" and "in no way" was "equivalent" to in-person instruction. (*Id.* ¶¶ 37–38.) The Academic Catalog, which contains course descriptions and education policies, stated that many courses would encompass in-person activities, like field trips, but as it turned out, virtual instruction has not provided anything comparable. (*Id.* ¶¶ 25–32, 34.) The Catalog contains a "reservation of rights" that allows the University to make changes to academic programs. (RR.) Nonetheless, virtual instruction deprived students of the on-campus experience, which the University markets as an advantage of being a student at Drew. (Compl. ¶¶ 36, 38.) Despite the discrepancy between what she expected and what she received, Crista did not receive a refund of any tuition or fees. (*Id.* ¶ 14.)

The Doughertys sued the University in New Jersey Superior Court, seeking to represent a class of students enrolled for the Spring 2020 semester. (*Id.* ¶ 40.) They asserted claims for (1) breach of contract, (2) unjust

---

[2]     Because the plaintiffs share the same last name, I refer to them by their first names, intending no disrespect.

[3]     The Complaint does not explain why Crista paid less than the full tuition amount.

enrichment, (3) conversion, and (4) money had and received. (*Id.* ¶¶ 53–88.) They allege that the Academic Catalog's course descriptions, which refer to in-person activities, were "promises" which the University broke when it transitioned to virtual learning. (*E.g.*, *id.* ¶¶ 24–32.) They allege that they reasonably expected an in-person education and on-campus experience, based on normal expectations and more specifically on the University's marketing statements. (*Id.* ¶¶ 33–38.) They seek damages consisting of a "pro-rata share of the tuition and fees" because in-person education was not provided for 49% of the semester. (*Id.* ¶ 64.)

The University removed the case to this Court. Although the parties are not diverse (the Doughertys are New Jersey residents) and the Complaint alleges no federal claims, the University invoked federal jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4, *codified in pertinent part at* 28 U.S.C. §§ 1332(d), 1441, 1446. (Notice ¶ 16.) *See* Section III.C.1, *infra.* A threshold issue in any putative class action, however, is whether the plaintiffs themselves possess a viable claim. *See Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987) ("[T]o be a class representative on a particular claim, the plaintiff himself must have a cause of action on that claim."). The University has moved to dismiss the Doughertys' complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (Mot.)

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v.*

3

*Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

## III.   DISCUSSION

At the threshold, I consider *sua sponte* whether plaintiffs possess Article III standing, a jurisdictional prerequisite. (Section III.A.) I then consider the substance of the Doughertys' claims regarding tuition (Section III.B) and fees (Section III.C). *See Burt v. Bd. of Trs. of the Univ. of R.I.*, --- F. Supp. 3d ----, ----, No. 20-465, 2021 WL 825398, at *3, 6 (D.R.I. Mar. 4, 2021) (analyzing the tuition and fees issues separately).

### A. Standing

Article III of the U.S. Constitution gives federal courts the power to hear "cases" and "controversies," U.S. Const. Art. III, § 2, which the Supreme Court interprets to mean that a plaintiff must have "standing," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998). To have standing, a plaintiff must have an injury that is traceable to the defendant and redressable by the suit. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021). Because standing is a component of jurisdiction, a federal court has an independent obligation to assure itself that standing exists. *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020).

The issue of standing, though not raised by the parties, suggests itself because courts in similar cases have held that such parent plaintiffs lack standing. *Metzner v. Quinnipiac Univ.*, --- F. Supp. 3d ----, ----, No. 20-cv-784, 2021 WL 1146922, at *4 (D. Conn. Mar. 25, 2021) (collecting cases). Those courts have reasoned that the parent, although the payor of tuition, was not injured, because the parent was not the person who received the allegedly inferior education. *Id.* While these courts acknowledge that generally parents can sue on behalf of minor children to challenge school conditions, that standing evaporates once the child reaches the age of majority. *Id.* While I do not find that reasoning implausible, I do not follow it here, for two reasons.

First, it is not really necessary to address Crista's standing. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see also N.J. Physicians, Inc. v. Pres. of U.S.*, 653 F.3d 234, 239 (3d Cir. 2011) ("Only one of the three named plaintiffs must establish standing in order for a court to consider the merits . . . ."). Angel has standing because she suffered an injury by receiving a different, allegedly lesser education than expected. This injury is sufficient to create a case or controversy, so I can proceed to the merits. In short, this case is going forward; Crista's presence in the caption is, at worst, superfluous.

Second, and regardless, I believe Crista's presence in the caption is appropriate. I remain unconvinced that a parent's ability to bring suit in these cases presents a jurisdictional issue of Article III standing. The Supreme Court and Third Circuit have explained that whether a contract "inures to the benefit of" a litigant, such that she can sue to enforce it, is a merits question, not a standing question. *Perry v. Thomas*, 482 U.S. 483, 492 (1987); *see Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 272 (3d Cir. 2004). Standing, to simplify a bit, focuses only on whether there is any injury. In analyzing that question, the court must "assume[] that the plaintiff's legal theory is correct because, were that not the case, the court would effectively be deciding the merits under the guise of determining the plaintiff's standing." *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020) (cleaned up); *see Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal . . . ." (citation omitted)).

So I assume, for standing purposes, the correctness of Crista's legal position that her relationship with the University was a contractual one. The standing question, then, is only whether the alleged breach would cause her a traceable and redressable injury. It would, because she paid tuition to the University and seeks what amounts to a refund. *See Mission Prods. Holdings,*

*Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019) ("any chance of money changing hands" presents a live controversy); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) ("[I]n the context of a motion to dismiss, . . . the [i]njury-in-fact element is not Mount Everest . . . . [We] requir[e] only that claimant allege some specific, identifiable trifle of injury." (alterations and citation omitted)). Crista thus has standing.

In sum, this suit presents a case or controversy, and there is no need to dismiss Crista as a plaintiff. This does not mean I have prejudged the issues of, *e.g.*, the existence or breach of a contract, or the possibility that Crista is a third-party beneficiary. Those are merits questions that will need to be worked out (and that the University has not yet raised). But they are not standing questions.

### B. Tuition Claims

#### 1. Breach of Contract

The Complaint alleges a breach of contract claim. (Compl. ¶¶ 53–64.) The Doughertys allege that the payment of tuition in exchange for an education represented a contract; that the Academic Catalog's descriptions of in-person instruction were contractual "promises"; and that the University breached those promises when it provided an inferior "virtual" (*i.e.*, online) education. (*Id.* ¶¶ 55–56, 59.) New Jersey courts apply a variety of modified standards to claims by students against universities. I therefore must first (a) decide what legal standard applies to the Doughertys' contract claim. I then (b) apply the appropriate standard to the claim. Finally, (c) I consider the University's alternative contention that the Catalog—even if an express contract—contains a reservation of rights that bars this claim of breach.

##### a. Standard

Generally, the standard courts apply in breach of contract cases is straightforward: The court determines what obligations the parties owed each other, often by interpreting the express contract, and decides if one party failed to do what it promised. *See Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d

386, 392 (N.J. 2019). In some ways, claims by a student against a university can resemble an ordinary breach of contract claim. *Mittra v. Univ. of Med. & Dentistry of N.J.*, 719 A.2d 693, 696–97 (N.J. Super. Ct. App. Div. 1998); *Napolitano v. Trs. of Princeton Univ.*, 453 A.2d 263, 272 (N.J. Super. Ct. App. Div. 1982). Nonetheless, New Jersey courts stress that the student-university relationship cannot be addressed "in pure contractual . . . terms." *Napolitano*, 453 A.2d at 272. Rather, universities are entitled to deference so that they can fulfill their educational role. *Id.* at 273. It follows that courts cannot "rigidly" apply a breach of contract standard to student-university disputes. *Id.* at 272 (citation omitted).

What standard should courts apply, then? New Jersey courts have suggested that the answer depends on context. *See Beukas v. Bd. of Trs. of Fairleigh Dickinson Univ.* (*Beukas I*), 605 A.2d 776, 781 (N.J. Super. Ct. L. Div. 1991) (applying a different standard from *Napolitano* when the context differed), *aff'd,* 605 A.2d 708 (N.J. Super. Ct. App. Div. 1992) (per curiam). In disciplinary contexts, which implicate the need for academic autonomy, the standard requires a showing not just that the university departed from its rules, but that it departed in a "substantial way." *Mittra*, 719 A.2d at 698 (dismissal of a student for academic reasons); *Napolitano*, 453 A.2d at 276 (disciplinary proceeding for plagiarism). Similarly, in other contexts ill-suited for judicial decision making, the Appellate Division has applied this deferential substantial-departure standard. *See Romeo v. Seton Hall Univ.*, 875 A.2d 1043, 1050 (N.J. Super. Ct. App. Div. 2005) (applying *Mittra* to university's denial of application to form a club because "[j]ust as in *Mittra*, where the evaluation of a student's academic performance is left to the judgment of the university, a private religious university's values and mission must be left to the discretion of the university"); *Mittra*, 719 A.2d at 697 (a modified standard is required when the case "bear[s] little resemblance to the type of inquiry traditionally performed by the courts"). Taking that cue from state-court decisions, federal courts have extended the substantial-departure standard to other contexts,

although none that closely resemble the facts of this case. *E.g.*, *Keles v. Bender*, Civ. No. 17-1299, 2021 WL 568105, at *6 (D.N.J. Feb. 16, 2021) (admissions decision), *appeal docketed*, No. 21-1497 (3d Cir. Mar. 17, 2021); *Doe v. Princeton Univ.*, 790 F. App'x 379, 385 (3d Cir. 2019) (sexual-assault investigation); *McMahon v. Salmond*, 573 F. App'x 128, 132 (3d Cir. 2014) (grading policy).

The case most closely parallel to ours is *Beukas I*, where students brought claims against a university for closing their college as a result of budget cuts. 605 A.2d at 780. The Superior Court declined to apply a highly deferential standard, like the substantial-departure standard, because the case implicated, not educational decisions, but the university's "*administrative* or business judgment." *Id.* at 781. *Beukas I* also declined to treat a course catalog as an express contract, because such catalogs are not written or commonly understood as contracts. *Id.* at 782. Lacking further guidance, the court fashioned a new standard: When students bring claims against a university for closing a program, it held, courts should ask, "Did the university act in good faith and, if so, did it deal fairly with its students?" *Id.* at 784. The trial court answered that question in the affirmative and found in favor of the university. The Appellate Division affirmed that judgment "substantially for the reasons expressed by" the trial court. *Beukas v. Bd. of Trs. of Fairleigh Dickinson Univ.* (*Beukas II*), 605 A.2d 708, 708 (N.J. Super. Ct. App. Div. 1992) (per curiam). Since then, the Appellate Division has approvingly cited *Beukas I*, albeit in a non-precedential opinion. *Gourdine v. Felician Coll.*, No. A-5248-04T3, 2006 WL 2346278, at *4 (N.J. Super. Ct. App. Div. Aug. 15, 2006) (per curiam).

*Beukas* and *Gourdine*, though far from a perfect fit, represent the most analogous New Jersey case law. Those cases and this one involve the university's modifying its educational offering on a large scale, in response to events outside its control, in conformity with concerns not particularly tied to

education as such. Given these close contexts, I will apply the *Beukas* standard.[4]

Applying *Beukas* also makes sense by default because other standards would not work. Start with ordinary contract law. It makes little sense to treat statements in a course catalog as express, contractual promises; they are not phrased as such, and frankly they seem more in the nature of "objectives, desires and hopes." *Beukas I*, 605 A.2d at 783 (quoting *Trs. of Columbia Univ. v. Jacobsen*, 148 A.2d 63, 66 (N.J. Super. Ct. App. Div. 1959) (refusing to recognize fraud claim based on university's alleged failure to meet the quality of academic courses as represented in the catalog)). Indeed, under ordinary contract principles, even a minor deviation from the course descriptions might constitute a breach. But at bottom, course catalogs just do not look like

---

[4] To be sure, federal courts are not bound to follow state trial court decisions or unpublished appellate decisions. *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, --- F. Supp. 3d ----, ----, Civ. No. 18-10675, 2021 WL 303030, at *3 (D.N.J. Jan. 29, 2021) (citations omitted); *Ryu v. Bank of Hope*, Civ. No. 19-18998, 2021 WL 50255, at *5 n.7 (D.N.J. Jan. 6, 2021) (citations omitted). Still, I give appellate opinions "due regard," *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 525–26 (3d Cir. 2019), so the affirmance in *Beukas II* imbues *Beukas I* with power in federal court, *see Ryu*, 2021 WL 50255, at *5 n.7. Moreover, between *Beukas* and *Gourdine*, three New Jersey courts have agreed on a standard, which weighs in favor of following it. *See Remicade*, 938 F.3d at 525–26 (following consensus of unpublished appellate cases); *Sunbeam Corp. v. Civ. Serv. Emp. Co-op. Ass'n*, 187 F.2d 768, 772 (3d Cir. 1951) (a consensus of non-binding decisions should be followed).

Other potential sources of law are unhelpful. The Doughertys rely on an oral decision by the Superior Court declining to dismiss similar claims. Tr. at 30:15–32:18, *Doval v. Fairleigh Dickinson Univ.*, No. L-4966-20 (N.J. Sup. Ct. Feb. 5, 2021) (attached as Ex. 2 to Opp.). This, however, is a bare trial court decision with no analysis.

The parties also point to out-of-state cases supporting their respective positions. *E.g.*, *Linder v. Occidental Coll.*, No. CV 20-8481, 2020 WL 7350212, at *7–9 (C.D. Cal. Dec. 11, 2020) (dismissing claim); *Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1217–18 (S.D. Fla. 2020) (denying motion to dismiss). I can perceive no majority view or trend. *See Ryu*, 2021 WL 50255, at *4 n.5. In addition, the states employ varying standards for student-university disputes, *see, e.g.*, *Linder*, 2020 WL 7350212, at *7 (applying California law which treats the student-university relationship as contractual), so out-of-state cases are inapposite to this dispute, which is governed by New Jersey law.

contracts which courts usually interpret, and I cannot regard this claim as a an ordinary "action for breach of the so-called catalog contract." 605 A.2d at 782 (quotation marks and citations omitted).

The substantial-departure standard is likewise ill-fitting. I would need to inquire whether the course experience was substantially different in a virtual versus in-person format. That inquiry would require the Court to find a breach of promise based on subjective assessments of academic quality or pedagogical effectiveness. Courts are generally to avoid such endeavors. *See Mittra,* 719 A.2d at 697.

That does not mean that the Doughertys have no potential claim. But any such claim will require the courts to apply a standard that balances students' reasonable expectations against a university's needs for institutional autonomy. *See Beukas I,* 605 A.2d at 784–85.

### b. Application

Applying the *Beukas* standard, I review "the *bona fides* of the [University's] decisionmaking and the fairness of its implementation." *Id.* at 785. In doing so, I pay close attention to whether that decision was arbitrary, made in bad faith, or lacking in fair notice. *Id.* at 782. These matters, unlike pedagogical ones, are ones that a court is equipped to assess.

The Complaint does not allege facts that plausibly show the University failed to meet its obligations under *Beukas.* The Complaint acknowledges that the move to virtual learning was due to the COVID-19 pandemic. (Compl. ¶¶ 7–8.) Further, the University explained that its closure was "consistent with" guidance from the state and federal governments. MaryAnn Baenninger, "Tuesday, March 10 – Drew Moves to Virtual Instruction and Business, Suspends Events and Gatherings through April 3," Drew Univ., http://www.drew.edu/1/emergency-information/coronavirus-disease-2019-covid-19-2/communications-to-the-drew-community/.[5] Because the

---

[5] The Complaint quotes from other portions of this statement and includes a link to it, so I may consider it on a motion to dismiss. *See Doe v. Univ. of Scis.,* 961 F.3d

University's decision was supported by public health concerns and compliance with the law, it was fair and not arbitrary. *See Beukas I*, 605 A.2d at 782, 784 (circumstances beyond the university's control supported decision to close program). The experience of other institutions, commercial, educational, and judicial, suggests that Drew University was not some sort of unreasonable outlier here.

Approaching the question from another angle, I note the lack of any allegation that the University possessed other, better options. For this reason, too, I lack a basis to fault the University's decision to pursue virtual learning. *See id.* at 784 (suggesting that the university could have been liable if there had been reasonable alternatives). While the Complaint alleges that virtual education was "subpar" (Compl. ¶ 37), to raise an inference of arbitrariness, the Complaint would at least need to allege that there was an alternative strategy that the University unreasonably chose not to pursue. To speak plainly, the plaintiffs do not really seem to be suggesting that the University could or should have ignored the pandemic and held in-person classes anyway.

I consider the Doughertys' narrower claim that, even if the University's actions cannot be faulted, they are nevertheless entitled to a partial refund.[6] (Compl. ¶ 11.) The theory would seem to be that, although the University did not fundamentally breach its contract because it still provided an education, it must compensate the students for lesser breaches, paying the difference in value between the education provided and expected. *See Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1218 (S.D. Fla. 2020).

---

203, 208 (3d Cir. 2020) (courts deciding a motion to dismiss may consider "a document integral to or explicitly relied upon in the complaint" (citation omitted)).

[6]     The plaintiff's alternative strategy, presumably, would have been to withdraw, wait out the pandemic, and resume her education later (or enroll at an institution unaffected by the pandemic, if one could be found). In that connection, I observe that upon the shift to virtual classes, the plaintiff did not seek to withdraw from or rescind the alleged contract, but completed the semester, suing for damages later on. Whether withdrawal on good terms would have been permitted, or a rebate given, is not known.

Case law forecloses such a claim. In *Gourdine*, the court rejected claims for a tuition rebate and held that *Beukas* did not require any specific actions by the college to discharge its obligations, although "the manner in which the institution sought to ease the closing of the program [] must be considered in the context of whether the institution acted in good faith." 2006 WL 2346278, at *5. In short, the issue comes back to whether the response the university adopted was reasonable in the circumstances. *See id.*; *Beukas I*, 605 A.2d at 784. Moreover, it is not as if the University simply defaulted on its educational obligations. Rather, the University tried its best to provide students with an education, albeit in a different format. The Doughertys may contend that such a format was not worth the same tuition money, but *Beukas* affords the University some leeway, particular when reacting to events beyond its control. Accordingly, it is not plausibly alleged that the Doughertys could overcome the *Beukas* standard.

All said, then, the Doughertys cannot prevail on their breach of contract claim when the correct standard is applied. But because I recognize that the COVID-19 situation is unprecedented, and the standard open to reasonable debate, I go on to assess an alternative basis for dismissal.

### c. Reservation of Rights

The University argues that, even if the Doughertys could pursue a contract claim based on the Academic Catalog, it would fail because the Catalog contained a reservation of rights that authorized the University's response to the pandemic. (Mot. at 13–17.)

*Beukas II* held that, even if the university catalog there was an enforceable contract, its "reservation of rights" provision allowed a university to close its dental school. 605 A.2d at 709; *see generally Barila v. Bd. of Educ. of Cliffside Park*, 230 A.3d 243, 255 (N.J. 2020) (when a contract's language is clear as to the party's obligation, "a court must enforce the agreement as written" (citation omitted)). That provision stated that "[t]he University reserves the right in its sole judgment to make changes of any nature in the University's

academic program, . . . . includ[ing], without limitation, the elimination of colleges." *Beukas II*, 605 A.2d at 708–09 (emphases omitted). That provision further stated that "[t]he University may suspend classes if they cannot be held for reasons beyond its reasonable control, such as . . . governmental actions." *Id.* at 709 (emphasis omitted). This language, the court held, modified the university's obligations and allowed it to close a school because of budget cuts. *Id.*; *see also Cruz v. Seton Hall Univ.*, Civ. No. 11-1429, 2012 U.S. Dist. LEXIS 96005, at *19 (D.N.J. July 10, 2012).

The provision in Drew University's Catalog is to the same effect. In fact, it is nearly identical to the one in *Beukas*. It grants the University "the right in its sole judgment to make changes of any nature in the University's academic program." (RR.)[7] Such changes include the "elimination" of "programs" and "the modification of [course] content." (*Id.*) Moreover, "the University may require or afford alternatives for scheduled classes . . . as is reasonably practical under the circumstances." (*Id.*)

The transition to virtual education and accompanying campus closure represent a change in the University's academic program that falls within this reservation's scope. Virtual education also represents an "alternative[] for scheduled classes" that the University was entitled to adopt. The Catalog, assuming it is a contract, permitted the University to act as it did without committing a breach.

In response, the Doughertys offer a few arguments. First, they argue that the provision is too broad, so it is ambiguous and unenforceable. (Opp. at 10–12.) That cannot be right under *Beukas II*, which enforced the same language. Regardless, "broad" language is not necessarily "ambiguous" language. *See Cherry Hill Towne Ctr. Partners, LLC v. GS Park Racing, L.P.*, Civ. No. 18-12868, 2019 WL 4187836, at *6 n.10 (D.N.J. Sept. 4, 2019); *Grande Vill. LLC v. CIBC*

---

[7]      Because the Complaint references the Catalog, I can consider the reservation of rights included therein and provided by the University with its motion. *See Univ. of Scis.*, 961 F.3d at 208.

*Inc.*, Civ. No. 14-3495, 2018 WL 2192707, at *16 (D.N.J. May 14, 2018). While the University's reservation of rights in the Catalog is far-reaching, its application to the facts here is clear enough.[8]

Relatedly, the Doughertys argue that the provision's meaning is a matter for summary judgment. (Opp. at 12.) The presence of ambiguity is a question of law. *Estate of Cohen, ex rel. Perelman v. Booth Computs.*, 22 A.3d 991, 1001 (N.J. Super. Ct. App. Div. 2011). In a particular case, of course, questions of fact can arise. But when unambiguous language on the face of the contract shows that the defendant acted within its rights, a court may dismiss a claim of breach. *See, e.g.*, *Eye Care Ctr. of N.J., P.A. v. Twin City Fire Ins. Co.*, Civ. No. 20-05743, 2021 WL 457890, at *2 (D.N.J. Feb. 8, 2021) (dismissing contract claim against insurer because exclusion clause in insurance contract permitted the denial of coverage), *appeal docketed*, No. 21-1315 (3d Cir. Feb. 24, 2021).

Next, the Doughertys argue that, even if the reservation of rights allowed the University to move to virtual education, they can still bring a claim to recover the difference in value between virtual and in-person education. (Opp. at 12–13.) This does not serve as a fallback, for the following reason: If, viewed in contractual terms, the Doughertys paid the University tuition in exchange for an education which the University expressly provided that it could modify, then the Doughertys have no claim of breach based on the University's having provided such a modified education. In other words, for these purposes it does

---

[8]    The Doughertys make a passing argument that the reservation of rights is a force majeure clause, which would require that the event excusing the University's performance (a pandemic) must be explicitly stated. (Opp. at 12–13 (citing *Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723, 727 (N.J. Super. Ct. App. Div. 2014)).) This reservation of rights does not read as a force majeure clause, which usually has, as its subject matter, events that will excuse performance (fire, flood, so-called acts of God, etc.). *Facto v. Pantagis*, 915 A.2d 59, 62 (N.J. Super. Ct. App. Div. 2007). Rather, this clause reserves discretion to the University, without regard to mischance. Even if this were a force majeure clause, the heightened specificity standard of *Hess* would not apply, because it is based on New York law. 86 A.3d at 727. New Jersey law provides that a force majeure clause is construed "like any other contractual provision." *Facto*, 915 A.2d at 62.

not matter whether the Doughertys seek a full tuition refund or diminution-in-value damages. The reservation of rights bars either claim.

All said then, even if I analyzed the Doughertys' claim as a normal breach of contract claim, it would fail based on the reservation of rights.

* * *

In sum, two grounds exist to dismiss the breach of contract claim in regard to tuition. First, applying the *Beukas* standard, the Complaint does not plausibly allege that the University failed in its obligations. Second, even applying normal contract principles, the claim fails because the reservation of rights permitted the University's actions. Count 1, as it relates to tuition, will therefore be dismissed.

### 2. Unjust Enrichment

The Complaint alleges a claim for unjust enrichment. (Compl. ¶¶ 65–71.) Unjust enrichment is a "quasi-contract doctrine" that applies when a party "received a benefit and [] retention of that benefit without payment would be unjust." *Thieme v. Aucoin-Thieme*, 151 A.3d 545, 557 (N.J. 2016) (citations omitted). Unjust enrichment often applies when a plaintiff cannot show that an express or implied contract existed, but still seeks to recover on principles of equity. *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, --- F. Supp. 3d ----, ----, Civ. No. 18-10675, 2021 WL 303030, at *5 (D.N.J. Jan. 29, 2021).

New Jersey courts have not addressed whether their reluctance to apply contract principles to student-university disputes extends to unjust enrichment claims. Federal courts interpreting New Jersey law, however, have applied the contract standards from *Mittra* and *Napolitano* to unjust enrichment claims. *McMahon*, 573 F. App'x at 133 n.4; *Webster v. Rutgers-N.J. Med. Sch.*, Civ. No. 15-08689, 2017 WL 3399997, at *12 (D.N.J. Aug. 4, 2017). I, too, find that an unjust enrichment claim should receive the same deferential treatment afforded contract claims. For this I give two reasons.

First, *Beukas I* announced its standard in terms broad enough to encompass unjust enrichment claims. The court wrote that the issue was what

15

"standard of review should be used to resolve a university-student conflict involving an administrative decision to terminate an academic or professional program." 605 A.2d at 781. Indeed, the court borrowed from other areas of the law, like administrative law, to craft its standard, suggesting a more general principle cutting across particular causes of action. *See id.* at 782–83. What is more, the court reasoned that the university-student relationship was already more akin to quasi-contract, because the parties' obligations were defined by law, and not strictly by mutual assent as in the contractual arena. *Id.* at 783–84. That being so, the court concluded that it could mold the obligations imposed. *Id.* at 784. If a court adjudicating an unjust enrichment claim seeks to imply legal obligations, it seems that *Beukas* has already done its work for it.

Second, it makes little sense to modify the standards for an actual contract claim, which applying ordinary contractual standards to an unjust enrichment claim. The modified standards in *Beukas*, *Mittra*, and *Napolitano* rested on the insight that the university is a unique institution, and that the university-student relationship therefore requires special handling. A plaintiff should not, by the simple expedient of pleading unjust enrichment, be empowered to set those powerful considerations aside. New Jersey courts have expressed a broad and general reluctance to interfere with the university-student relationship, and that general reluctance applies equally to actions in quasi-contract or unjust enrichment.

Accordingly, the *Beukas* standard also applies to the unjust enrichment claim. For the reasons I gave in Section III.B.1, the University has satisfied its obligations under that standard. Thus, Count 2 will be dismissed in relation to tuition charges.

### 3. Conversion

Count 3 of the Complaint asserts a tort claim of conversion. (Compl. ¶¶ 72–79.) "[C]onversion is the intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 661 (N.J. 2020). The

Complaint alleges that the Doughertys had an "an ownership right to [] in-person educational services," which the University "interfered" with by switching to virtual education. (Compl. ¶¶ 74–75.) Seemingly in the alternative, the Complaint alleges that the Doughertys' tuition payment is their property, which must be returned to them. (*See id.* ¶¶ 76–78.) Either way, the conversion claim fails, for two reasons.

First, for the reasons stated in Section III.B.2, *supra*, the *Beukas* standard should apply to the conversion claim. The conversion claim here is the merest recasting of the contract claim, and the same *Beukas*-based policy considerations apply. Because the University satisfied the *Beukas* standard, no conversion claim is plausible.

Second, the conversion claim fails even on its own terms. The allegations do not satisfy the essential elements of the tort.

The Complaint alleges (as one alternative) that the "property" at issue is an in-person education, but conversion applies to chattel. Chattel is "[m]ovable or transferable property," especially "a physical object capable of manual delivery." *Chattel*, Black's Law Dictionary (11th ed. 2019). Education is not physical property, and New Jersey courts do not apply conversion to intangible property. *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 357 (D.N.J. 2019). In the absence of New Jersey case law greenlighting the novel claim here, I decline to expand conversion to encompass claims that a particular kind of instruction is "property." *See City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002) ("[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent."); *Burt*, 2021 WL 825398, at *8 (declining to recognize same conversion claim because Rhode Island law did not apply conversion to intangibles).

The Complaint alleges (as a second alternative) that the "property" at issue is the tuition payment. Now money, of course, *may* be the subject of a conversion claim. *Meisels*, 222 A.3d at 660. But the law draws a line, if a somewhat arbitrary one, between a claim that one is owed money, and a claim

17

that a particular pot of money was taken or wrongfully diverted to the defendant's own use. That is, the money must be "identifiable." *Id.* at 660–61 (concerning wired funds). A claim for conversion thus must be distinguished from a debt, or a claim that one is owed money as the result of a breach of contract. *See Bondi v. Citigroup, Inc.*, 32 A.3d 1158, 1190 (N.J. Super. Ct. App. Div. 2011) (conversion cannot recover a "mere debt" (citation omitted)); *see also Weiss v. Rutgers Univ.*, Civ. No. 12-6834, 2014 WL 2608201, at *7 (D.N.J. June 10, 2014) (dismissing conversion claim for tuition following student's allegedly wrongful dismissal from university). The conversion claim here is no different from the contract claim. Both seek money representing the difference in value between the virtual education provided and the in-person education expected. (Compl. ¶¶ 64, 79.) That is the "traditional remedy for breach of contract." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (contract damages usually represent the "loss of the benefit of the bargain" and seek "to put the injured party in as good a position as if performance had been rendered" (citations omitted)).

For those reasons, Count 3 will be dismissed to the extent it seeks tuition.

### 4. Money Had and Received

The Complaint asserts a claim for "money had and received." (Compl. ¶¶ 80–88.) The elements of such a claim are essentially the same as those for unjust enrichment. *See Hartford Accident & Indem. Co. v. Benevento*, 44 A.2d 97, 100 (N.J. 1945). Both are quasi-contract claims, *see id.*, and the federal courts have construed them in parallel, *e.g.*, *Lelo v. Lelo*, Civ. No. 18-3454, 2018 WL 2432904, at *2 (D.N.J. May 30, 2018); *N.Y. Pipeline Mech. Contractors, LLC v. Sabema Plumbing & Heating Co.*, Civ. No. 10-148, 2012 WL 209349 at *2 & n. 2 (D.N.J. Jan. 24, 2012). As a result, the claim for money had and received fails for the same reasons as the unjust enrichment claim. *See* Section III.B.2, *supra*.

Count 4 will be dismissed as it relates to tuition.

18

### C. Fee Claims

I move on to the Doughertys' claims as they relate to payment of art, parking, and technology fees. (Opp. at 16–17.) Before I address the merits of these claims for fees, I consider whether I have jurisdiction over them.

### 1. Continuing Jurisdiction

I observe at the outset that the Doughertys themselves did not seek this federal forum; the case, which asserts only state-law causes of action, was removed to this court by the University based on the Class Action Fairness Act. The University, as the party removing this case to federal court, bears the burden of showing that jurisdiction is proper. *Judon v. Travelers Property Cas. Co. of Am.*, 773 F.3d 495, 500, 502 (3d Cir. 2014).

An issue of this Court's subject matter now arises because the failure of the tuition claims means that the amount in controversy is nowhere near the minimum jurisdictional level. CAFA grants federal courts jurisdiction over class actions when (1) the parties are minimally diverse, (2) the class consists of at least 100 members, and (3) the amount in controversy exceeds $5 million. *Id.* at 500 (citing 28 U.S.C. § 1332(d)(2), (5)(B), (6)). The first two elements are satisfied.[9]

The Complaint cannot satisfy the third element, however, if the tuition claims fall out. To estimate the amount in controversy based on the pleadings, I multiply the number of proposed class members by the damages a typical class member would assert. *Id.* at 506–07. The Complaint alleges that the Doughertys paid $400 in fees but acknowledges that fees paid by class members will "vary." (Compl. ¶¶ 14, 22.) I thus do not have a basis to estimate damages for a fee class because there is no typical class member. Nor are the

---

[9]     First, minimal diversity means "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). The University is a New Jersey citizen, and so are the Doughertys, but 43% of students for the Spring 2020 semester hailed from other states or countries. (DE 3.) Second, that semester had 2,000 students enrolled, so the class exceeds 100 members. (Compl. ¶ 2; Notice ¶ 21.)

Doughertys' fees necessarily typical. It is not reasonable to assume that all proposed class members paid an art or parking fee, because not all students take art classes or commute to campus by automobile. *See Judon*, 773 F.3d at 507 (when estimating the amount in controversy, "an assumption must be grounded on some reasonable inference that can be drawn from fact"); *Smith v. HSN, Inc.*, Civ. No. 20-12869, 2020 WL 7022640, at *6 (D.N.J. Nov. 30, 2020) (declining to assume that all proposed class members in a products-liability action suffered burns like the plaintiff's). Regardless, even if I considered their $400 fee payments as typical, and multiplied them by 2,000 possible class members (Compl. ¶ 2; Notice ¶ 21), the amount in controversy would total only $800,000. Nor can I find on this record that the University has reasonably established that other potential damages would get the case over the $5 million threshold.[10] The CAFA amount in controversy is not satisfied.[11]

When the failure of some claims brings the amount in controversy in a CAFA case below $5 million, what is a district court to do? There is scant authority. Generally, courts assess CAFA jurisdiction based on the pleadings at the time of removal. *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593

---

[10]    I do not perform any detailed analysis because I find that the court's jurisdiction is not affected. *See infra.* Briefly, the amount in controversy may include punitive damages or attorney's fees, if available. *Judon*, 773 F.3d at 508 n.12; *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 227 (3d Cir. 2019). But punitive damages are not available for actions, like this one, that sound in contract. *Buckley v. Trenton Saving Fund Soc'y*, 544 A.2d 857, 865 (N.J. 1988). Even if they were, punitive damages cannot be considered without a reasonable estimate of compensatory damages, which I lack. *Judon*, 773 F.3d at 508 n.12. *See also* N.J. Stat. Ann. § 2A:15-5.14(b) (in any event, punitive damages are capped at five times the amount of compensatory damages). Attorney's fees are recoverable if authorized by statute, *Innes v. Marzano-Lesnevich*, 136 A.3d 108, 113 (N.J. 2016), but the Doughertys do not sue under any such statute. *See also Magnet Res., Inc. v. Summit MRI, Inc.*, 723 A.2d 976, 985 (N.J. Super. Ct. App. Div. 1998) (contractual damages do not include attorney's fees); *New Flyer of Am., Inc. v. Mid-Newark, L.P.*, 2010 WL 2794249, at *6–7 (N.J. Super. Ct. App. Div. July 6, 2010) (per curiam) (same).

[11]    I could not rely on any other basis of federal jurisdiction. There is no federal claim asserted. The Doughertys and the University are not of diverse citizenship, and regardless, the Doughertys' individual claims do not exceed $75,000.

(2013). Even long before CAFA, the Supreme Court held that events following initiation of a case that reduce the amount in controversy do not deprive the federal court of jurisdiction. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293–94 (1938). Applying that general rule here, dismissing the tuition claims does not mean I lose jurisdiction over the fee claims just because they do not independently meet CAFA's amount in controversy requirement. A Rule 12(b)(6) dismissal is a post-removal event, so it should not act to deprive me of jurisdiction. In short, "CAFA anchored jurisdiction at the time of removal." *F5 Capital v. Pappas*, 856 F.3d 61, 76 (2d Cir. 2017).

The closest precedent in this Circuit supports that conclusion. Simplified, in *McNair v. Synapse Group Inc.*, some claims were dismissed for lack of standing, and the claims that remained did not independently satisfy CAFA's amount in controversy requirement. Civ. No. 06-5072, 2012 WL 13034150, at *1 (D.N.J. Aug. 24, 2012). Judge Linares held that because "case developments subsequent to the attachment of original federal jurisdiction do not later oust the district court's jurisdiction," he would not dismiss the remaining claims. *Id.* at *2 (citing *Red Cab*, 303 U.S. at 292). I agree and will proceed to the merits of the fee-based claims.

### 2. Merits

The Doughertys argue that even if their tuition claims fail, their fee claims survive. Courts have treated such fee-based claims, as opposed to tuition claims, as typical contract claims, and have not applied the deferential standards governing other student-university disputes. (Opp. at 16–17.) I agree.

*Beukas*, *Napolitano*, and *Mittra* did not include any discussion of fees. While *Beukas I* created a standard for cases involving school or program closures, it created that standard only in the context of whether plaintiff-students could recover tuition. 605 A.2d at 779. *Beukas I* did not discuss whether its standard also applied to claims for more minor fees.

21

There is good reason that it should not. *Beukas*-style claims, in which I include the tuition claims here, go to the core of the university's pedagogical mission. Such concerns are absent in the case of fee-based claims. When a university charges fees relating to its use of facilities, it acts more as a building proprietor or business entity than an academic institution. *See, e.g.*, *Burt*, 2021 WL 825398, at *6–7; *In re Columbia Tuition Refund Action*, --- F. Supp. 3d ----, ----, No. 20-CV-3208, 2021 WL 790638, at *7 (S.D.N.Y. Feb. 26, 2021); *Little v. Grand Canyon Univ.*, --- F. Supp. 3d ----, ----, No. CV-20-00795, 2021 WL 308940, at *4 (D. Ariz. Jan. 29, 2021). The relationship between the student as payor of those fees and the university is not the unique university-student relationship of which *Beukas*, *Napolitano*, and *Mittra* spoke. Special rules, then, should not apply. The judiciary is well-equipped to decide these standard-fare contract claims regarding fees. *Columbia Tuition*, 2021 WL 790638, at *7.

Adjudication of claims for these specific fees risks no intrusion upon the interests New Jersey courts have sought to protect. Start with the parking fee. It strains reason to think that courts should defer to universities or otherwise treat them specially when a plaintiff claims that she paid for parking that was never provided. Acting in this capacity, the university should get the same treatment as a commercial parking garage. As to the art and technology fees, the allegation seems to be that they were intended to cover the student's use of on-campus art facilities and technologies. Here, too, the University acted in the capacity of a facilities proprietor which at some point cut off access to the facilities. These claims are of the same ilk as claims by paid-up members of a fitness center that closed for the duration of the pandemic.

Applying normal contract principles, I find that Count 1 states a claim for breach of contract in relation to the fees. A breach of contract claim requires "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Mid-Atl. Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 226 (3d Cir. 2020)

(citation omitted). Although the Complaint does not allege that there was any written parking or facility agreement, I can infer a contract based on the circumstances. *Read v. Profeta*, 397 F. Supp. 3d 597, 626 (D.N.J. 2019) (citations omitted). Payment in exchange for parking or access to facilities represents the mutuality of obligation necessary for a valid contract. Next, the University failed to perform its obligation by not providing parking or facility access for half the semester. The Doughertys faced damages as a result because they paid for something they did not receive. There may be defenses, but they have stated a breach of contract claim.[12]

Likewise, Count 2 of the Complaint states an unjust enrichment claim in relation to fees. Unjust enrichment claims can be pleaded in the alternative in case no contract is found to exist. *Gap Props., LLC v. Cairo*, Civ. No. 19-20117, 2020 WL 7183509, at *4 (D.N.J. Sept. 17, 2020) (citations omitted). Such alternative pleading makes sense here because the University may predictably point to the lack of any specific, written agreement regarding the fees. The Complaint pleads facts suggesting that the University "received a benefit" (payment of the fees) and that "retention of that benefit" would be "unjust" because the University did not provide anything in return for half the semester. *Thieme*, 151 A.3d at 557 (citations omitted).

Counts 3 and 4, however, cannot be maintained, even with respect to fees. As explained, the Doughertys cannot pursue a conversion claim that is just a contractual claim or a claim over a "mere debt." *Bondi*, 32 A.3d at 1190 (citation omitted). Their fee claim is such a claim, as they do not dispute. The

---

[12]    The reservation of rights in the Catalog is not relevant to these claims. That provision allows the University to make changes to the "academic program, courses, schedule, or calendar" as well as offer "alternatives for scheduled classes." (RR.) Parking is not part of any of that. The precise purpose of the art and technology fees is not clear on the face of the Complaint, but construing the allegations in favor of the Doughertys, these are facilities fees, sufficiently separate from a program of instruction.

claim for money had and received will be dismissed as duplicative of the unjust enrichment claim; it contributes nothing but clutter.[13]

For these reasons, Counts 3 and 4 will be dismissed to the extent they seek fees, meaning that they are now dismissed in their entirety. But to the extent the University moves to dismiss Counts 1 and 2 based on fees, the motion to dismiss will be denied.

## IV.   CONCLUSION

For the reasons set forth above, the motion to dismiss is granted in part and denied in part. Counts 3 and 4 will be dismissed in their entirety. Counts 1 and 2 will be dismissed to the extent they seek tuition. But the motion to dismiss is denied to the extent it seeks to dismiss Counts 1 and 2 as they relate to fees.

A separate order will issue.

Dated: April 14, 2021

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**

---

[13]      Should it emerge, for some unanticipated reason, that it is not duplicative, Plaintiffs may seek to amend their claims to restore it.